IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| vs. | ) Criminal No. 09-299 |
| | ) |
| NANIEIL HANOON SHAKY, | ) |
| | ) |
| Defendant. | ) |

O R D E R

AND NOW, this 4th day of November, 2010, upon consideration of Defendant's Motion to Suppress Statements (Document No. 36) filed in the above-captioned matter on August 2, 2010, and upon further consideration of the Government's Response thereto (Document No. 48), and after consideration of the testimony at the hearing held before this Court on October 5, 2010, regarding the Motion,

IT IS HEREBY ORDERED that said Motion is DENIED.

Defendant is charged in a one-count indictment with falsely and willfully representing himself to be a United States citizen, in violation of Title 18, United States Code, Section 911. Defendant seeks to suppress statements obtained by law enforcement on February 26, 2008,[1] based on alleged violations of

---

[1] To the extent the motion seeks to suppress any other statements Defendant allegedly made to law enforcement officers on a number of other occasions, the motion is denied as moot because the

1

Defendant's Fifth Amendment rights to counsel and against self-incrimination.

On October 5, 2010, the Court heard testimony and evidence. The Government presented the testimony of James Garr and offered one exhibit, which the Court admitted. On the basis of this evidence and the parties' filings, the Court finds no merit to Defendant's argument.

I.  **Facts**

The facts relevant to this motion are undisputed. On the basis of his marriage to an American citizen, Defendant, a citizen of Iraq and Australia, was granted Conditional Permanent Resident status in the United States. On January 7, 2002, his conditional status expired.

On June 11, 2002, Defendant obtained a Pennsylvania firearms license, which was issued for a five-year period. On the application for the license, Defendant indicated that he was a resident alien and provided his alien registration number.

By letter dated September 13, 2002, Citizenship and Immigration Services (CIS) notified Defendant that his Conditional Permanent Resident status had been terminated of January 7, 2002. On October 8, 2002, Defendant filed a Form I-751, "Petition to Remove Conditions on Residence," jointly with

---

Government represents that it does not intend to use these statements at trial.

his wife. However, on November 18, 2003, Defendant and his wife divorced.

On January 3, 2004, Defendant purchased a firearm.

After his divorce, on May 11, 2006, CIS denied his first Form I-751 petition. By letter dated November 3, 2006, through his attorney, Valerie L. May, Defendant filed a second Form I-751 "Petition to Remove Conditions on Residence" with CIS, which included a waiver of the joint filing requirement based on a good faith marriage that ended in divorce. See Exhibit A to Doc. No. 36.

On June 18, 2007, Defendant sought to renew his firearms license. On the application, Defendant answered "yes" to this question: "Are you a United States citizen?" Defendant was not and has never been a United States citizen. Federal law enforcement officers were contacted because of the discrepancy between Defendant's 2002 application and 2007 application. An officer from the Pittsburgh Joint Terrorism Task Force (JTTF) then contacted Immigration and Customs Enforcement (ICE) Special Agent James Garr. After a review of Defendant's file, Garr determined that Defendant had no valid immigration status. Garr was concerned that if Defendant possessed a firearm without a valid immigration status, Defendant would have been in violation of federal law. During his review of Defendant's immigration status, Garr became aware that Defendant was represented by

Attorney May, who had filed a "Petition to Remove Conditions of Residence" with CIS on his behalf.

Late in the morning of February 26, 2008, Garr interviewed Defendant about his possession of a firearm. The meeting had been scheduled with Defendant at his residence for the purpose of discussing his purchase and possession of a firearm. Before initiating the interview, Garr did not contact Attorney May.

Garr came with two JTTF Officers, Michael Pampena and Terry Lewis. The agents arrived at Defendant's residence and knocked on the door. Defendant answered the door and let them in. It appeared to Garr that Defendant was familiar with Pampena and Lewis. Pampena introduced Defendant to Garr, who showed Defendant his credentials. The officers' weapons were not drawn and were not visible. Other than shaking hands with Defendant when they arrived and departed, the officers had no physical contact with Defendant. The officers did not advise Defendant of his <u>Miranda</u> rights or tell him that he was free to leave at any time or that he did not have to answer their questions.

After showing Defendant his identification, Garr explained that the purpose of his visit was to discuss Defendant's purchase and possession of a firearm. Garr asked to see the gun. Defendant left the room unaccompanied, retrieved the firearm and gave it to Garr, who made sure the gun was not loaded.

Garr and Defendant sat at Defendant's dining room table, while Pampena and Lewis sat on the couch near the front door. Garr asked Defendant about his identity, his immigration status, and his alienage. Garr explained to Defendant that because he had no currently valid immigration status, Defendant was not able to legally purchase or possess the firearm. Although Garr did not know whether Defendant could comprehend written English, Garr believed that Defendant could orally communicate in and comprehend English.

Garr asked Defendant if he would be willing to put the information they had discussed into a statement, which he would have the opportunity to review and make any changes or corrections. Defendant agreed. Garr drafted a statement for Defendant and reviewed each sentence with Defendant as Garr composed it. After Defendant was sworn, he then signed the statement. Defendant agreed to abandon the firearm and asked that it be returned on the reinstatement of a valid immigration status. Defendant was with the officers for approximately 45 minutes to one hour.

## II. **Discussion**

Based on these facts, Defendant contends that his Fifth Amendment rights[2] were violated when he was subjected to a

---

[2] Defendant does not allege that his Sixth Amendment right to counsel was violated. The Sixth Amendment "right to counsel

5

custodial interrogation without being advised of his <u>Miranda</u> rights.[3] The Court disagrees.

Defendant was not advised of his <u>Miranda</u> rights before he answered Garr's questions. While he was not formally arrested, Defendant was in fact interrogated,[4] and he made oral and written statements. Thus, the only question here is whether Defendant was "in custody" when he made his statements to Garr.

<u>Miranda</u> warnings are only required when an individual "has been deprived of his or her freedom in some significant way." <u>United States v. Leese</u>, 176 F.3d 740, 743 (3d Cir. 1999). The determination of whether a "custodial interrogation" has

---

does not attach until the initiation of adversary judicial proceedings. . . ." <u>United States v. Gouveia</u>, 467 U.S. 180, 188 (1984) (citations omitted).

[3] In <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), the Supreme Court concluded that, in the context of "custodial interrogation," certain procedural safeguards are necessary to protect a defendant's Fifth and Fourteenth Amendment privilege against compulsory self-incrimination. Thus, "unless the government has advised a defendant of his rights, it cannot put into evidence statements stemming from the 'custodial interrogation of the defendant.'" <u>Young v. Patton</u>, 710 F.2d 956, 961 (3d Cir. 1983), <u>reversed on other grounds</u>, 467 U.S. 1025 (1984). A person must be told about a number of rights he possesses, including, as part of this right against self-incrimination, the right to the presence of an attorney during questioning. <u>Miranda</u>, 384 U.S. at 479.

[4] The Government does not dispute the fact that Defendant was "interrogated." Interrogation refers to "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the subject." <u>Rhode Island v. Innis</u>, 446 U.S. 291, 300-01 (1980).

6

taken place must be made on a case-by-case basis. Id. Custody may be shown either by a formal arrest or by restraint on freedom of movement of the degree associated with a formal arrest. Id. (citing California v. Beheler, 463 U.S. 1121, 1125 (1983)). When an individual has not been formally arrested, the authorities must give some indication "either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or allow the suspect to do so." Steigler v. Anderson, 496 F.2d 793, 799 (3d Cir. 1974) (citation omitted). Thus, "police officers are not required to administer Miranda warnings to everyone they question." Oregon v. Mathiason, 429 U.S. 492, 495 (1977). Nevertheless, if a person is the focus of the investigation, this may be a factor in determining whether an interrogation is custodial. Steigler, 496 F.2d at 799-800.

"[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by the interrogating officers or the person being questioned." Stansbury v. California, 511 U.S. 318, 323 (1994). The question is whether "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." Thompson v. Keohane, 516 U.S. 99, 112 (1995). Some of the objective factors to consider are: whether the officers told the suspect that he was under arrest or free

to leave; the location of the interrogation; the length of the
interrogation; whether officers used coercive tactics or
physical restraint; and whether the suspect voluntarily
submitted to questioning. United States v. Willaman, 437 F.3d
354, 359 (3d Cir. 2006) (citations omitted). A custodial
interrogation may occur outside the police station. Orozco v.
Texas, 394 U.S. 324, 326-27 (1969) (suspect in custody when
questioned after being awakened in his room by four officers).

The circumstances in this case establish that Defendant was
not "in custody" during his interrogation on February 26, 2008.
Defendant knew that officers were coming to his home to talk to
him, and he was told what the purpose of the visit was going to
be. When the officers arrived in the late morning, he answered
the door and let them into his home. Defendant was not formally
arrested. It appeared to Special Agent Garr that Defendant was
familiar with the other officers. Garr identified himself,
shook Defendant's hand and showed his credentials. The officers
did not display or draw their weapons or use physical
restraints. Once inside the house, Garr engaged Defendant in
conversational tones and explained the purpose of his visit.
While Garr knew that Defendant was born in Iraq, Garr also knew
that Defendant had been in the United States since at least
2000. In addition, Defendant appeared to be able to effectively
communicate in English. While seated at his dining room table,

Defendant voluntarily answered Garr's questions, while the other officers were seated on a couch near the front door. Garr composed a statement for Defendant and reviewed it with him line by line. Defendant agreed that the written statement accurately reflected his oral statements and signed it.

The length of the meeting was consistent with its stated purpose and the manner in which Garr obtained Defendant's written statement. While the officers never advised him that he did not have to answer their questions or that he was free to leave, he was not intimidated or otherwise prevented from terminating the encounter.[5] Defendant was never subjected to the obvious indicia of custody, such as arrest or physical restraint, nor was he subjected to any coercive tactics. In addition, the fact that Defendant was the sole focus of the investigation is not conclusive because it is "the compulsive aspect of custodial interrogation, and not the strength or content of the government's suspicions at the time the

---

[5] Defendant cites United States v. Mahmood, 415 F.Supp.2d 13, 17 (D.Mass. 2006), in which an ICE interrogation was found to be custodial. Some of the factors considered in Mahood are similar to those present here, such as the fact that Special Agent Garr never told Defendant that he was free to leave or that he did not have to answer questions. Nevertheless, the Court is satisfied that the present case is otherwise factually distinguishable from Mahood, in which, for example, the defendant credibly testified about the coercive atmosphere the officers created after appearing unannounced and knowing of a language barrier.

9

questioning was conducted" that triggers the necessity of Miranda warnings. Stansbury, 511 U.S. at 323 (quoting Beckwith v. United States, 425 U.S. 341, 346-47 (1976)). All of these factors show that Defendant was not "in custody" when he was interrogated by Special Agent Garr, who, under the circumstances presented here, was not required to administer Miranda warnings before questioning Defendant.[6] Willaman, 437 F.3d at 359-60.

Furthermore, while Defendant correctly notes that Miranda provides a narrow Fifth Amendment right to counsel, Defendant was not "in custody," and, for the reasons already explained, Garr had no duty to advise Defendant of this right, even though Garr knew that Defendant was represented by an attorney with regard to a petition filed with Citizenship and Immigration Services.

III. **Conclusion**

For the reasons set forth herein, the Court finds that Defendant was not in custody and, therefore, not entitled to receive Miranda warnings, when he made statements to Special

---

[6] Defendant argues that one of the factors that made his interrogation custodial was that Garr asked him to produce identification and immigration documentation. However, Defendant has no Fifth Amendment privilege to refuse to answer questions about his immigration status. Rajah v. Mukasey, 544 F.3d 427, 441-42 (2d Cir. 2008). Defendant was required to maintain these documents as part of a civil regulatory scheme and, by entering the country and receiving an immigration benefit, waived any right he might have had to refuse to answer questions or produce documents about his immigration status. Id. at 442.

10

Agent James Garr. Therefore, Defendant's motion to suppress the statements he made on February 26, 2008, is denied.

                                                            s/Alan N. Bloch
                                                            United States District Judge

ecf:      Counsel of record